2015 IL App (3d) 140429

Opinion filed September 17, 2015

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

A.D., 2015

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 13th Judicial Circuit, La Salle County, Illinois, |
|---|---|---|
| Plaintiff-Appellee, | ) ) | Appeal No. 3-14-0429 |
| v. | ) ) | Circuit No. 12-CF-131 |
| ERIC LITWIN, | ) ) ) | The Honorable H. Chris Ryan, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE McDADE delivered the judgment of the court, with opinion.
Justice O'Brien concurred in the judgment and opinion.
Justice Carter dissented, with opinion.

**OPINION**

¶ 1     The defendant, Eric Litwin, was convicted of unlawful cannabis trafficking (720 ILCS

550/5.1(a) (West 2012)) and was sentenced to 12 years of imprisonment. On appeal, the

defendant argues, *inter alia*, that the circuit court erred when it denied his motion to quash arrest

and suppress evidence on the basis that the duration of the traffic stop had not been unreasonably

prolonged. We reverse.

¶ 2                                        FACTS

¶ 3    After a traffic stop in March 2012, the defendant was charged by indictment with unlawful cannabis trafficking (*id.*) and unlawful possession of cannabis with the intent to deliver (720 ILCS 550/5(g) (West 2012)).  The defendant, through counsel, filed a motion to quash arrest and suppress evidence, alleging that the initial stop was not justified and that the duration of the stop was unreasonably prolonged.

¶ 4    The circuit court held a hearing on the motion in January 2013.  Utica police officer Jerry Nanouski testified that on March 10, 2012, he had his vehicle positioned in the median on Interstate 80 when he observed the defendant's vehicle cross the fog line.  Nanouski initiated a traffic stop of the defendant for improper lane usage.  Nanouski issued a warning ticket to the defendant; he did not recall how long after the stop was initiated that he wrote the ticket, but the ticket stated 12:17 p.m.  Nanouski testified that he smelled cannabis emanating from the defendant's vehicle while he was talking to the defendant, but that he did not say anything about the odor until after he had asked the defendant for consent to search the vehicle and been refused.  When asked why he sought consent to search even though he had smelled cannabis, Nanouski stated that "[b]ecause I was hoping that he would say yeah, you can have a look."

¶ 5    Nanouski estimated that he had performed approximately 3,000 traffic stops that involved cannabis, that there was a difference between the smell of burnt cannabis and raw cannabis, and that he was familiar with both.  He testified that he asked the defendant if anyone had smoked or had cannabis in the vehicle, but acknowledged that his report stated only that he asked the defendant if anyone had smoked cannabis in the vehicle.

¶ 6    Nanouski also testified that Illinois State Police trooper Jeffery Nichols pulled up approximately 10 minutes after Nanouski had stopped the defendant, and that he asked Nichols

2

to perform a free-air sniff around the defendant's vehicle. Nichols' dog was distracted by the dog Nanouski had in the back of his vehicle, and Nichols' dog did not alert during the process.

¶ 7    Nichols testified that he had been an Illinois State Police trooper for about six years, and a K-9 officer for about four and one-half years. He had been working with his current dog since December 2011. He and his dog made two passes around the defendant's vehicle, and his dog did not alert or even perform a sniff and Nichols himself did not smell any odor of cannabis emanating from the defendant's vehicle. Nichols explained that his dog wanted to play with Nanouski's dog and both dogs were barking at each other.

¶ 8    The videotape from the recording device in Nanouski's vehicle was played for the court and introduced into evidence. The time stamp recorded on the video was 2:14 p.m., and when it started, the trunk of the defendant's vehicle was already standing open, some personal effects were on the ground, and four officers were visible. The recording lasted approximately 10 minutes, and showed the defendant's personal effects being searched and pictures being taken of the vehicle and those personal effects. Nanouski's vehicle left the scene at approximately 2:24 p.m. Nanouski testified at this hearing that the recording device in his vehicle was "bad" and that it malfunctioned half of the time.

¶ 9    The defendant testified that Nanouski approached the passenger side of his vehicle at the outset of the stop. Several times over the span of at least 30 minutes, Nanouski would talk to the defendant for a time and then walk away. Other police vehicles began to arrive on the scene around 15 to 20 minutes into the stop. Nanouski took the defendant's license, and about 45 minutes after the stop began, gave the defendant a warning ticket and asked for the defendant's consent to search the vehicle. The defendant refused, but Nanouski told him to stay where he

3

was.  The defendant denied that Nanouski ever asked him if anyone had smoked cannabis in the vehicle and also denied that there was a smell of raw or smoked cannabis in the vehicle.

¶ 10      The defendant stated that Nichols' K-9 unit arrived just after Nanouski gave the defendant the warning ticket.  When Nichols arrived, he talked with Nanouski for about 10 minutes before Nanouski approached the vehicle and asked to search.  After the defendant declined, Nichols approached the vehicle, leaned in at a window, and explained to the defendant what he was going to do with the dog.  Nanouski gave the defendant instructions as Nichols performed the free-air sniff, which included opening and closing certain windows at certain times.  The defendant claimed that Nichols walked the dog around the vehicle numerous times during a span of about 30 minutes.

¶ 11      The defendant testified that next, Nanouski, Nichols, and two or three other officers talked near the passenger side tire of Nanouski's vehicle for approximately 10 minutes, after which they instructed the defendant to exit the vehicle and stand by one of the officers. Nanouski and another officer walked away for a few minutes and when they came back, Nanouski told the defendant he was going to search the car because he smelled raw cannabis.  In total, about an hour-and-a-half had passed from the beginning of the stop to the point at which the search began.  After Nanouski opened the trunk and looked inside, the defendant was arrested and placed inside the last of four or five police vehicles that had lined up at the scene. The defendant also stated that they arrived at the Utica police department around 3 p.m.

¶ 12      On cross-examination, the defendant denied telling Nanouski that he was tired.  The defendant said he told Nanouski he was hungry and he had intended to get some lunch.  The defendant also stated that he remembered looking at the clock in his vehicle when they had the

4

conversation about lunch; the clock read 11:47 p.m. He also stated that he never heard any dogs bark.

¶ 13        The defense also presented the testimony of Alex Brooks, a self-employed dog trainer with 35 years of training experience, including training dogs for law enforcement between 1982 and 1990. Brooks did not have knowledge of current Illinois State Police guidelines regarding dog training, but the circuit court allowed him to testify as an expert in dog training. Brooks' testimony included the following exchange with defense counsel:

"[DEFENSE COUNSEL]:     And a dog that has been properly -- is being properly handled and utilized will not react to another dog. Is that correct?

[BROOKS]:     Correct. And if I may add, too, I mean, you know, every -- every -- every living thing has a bad day. I mean, you know, for the dog to miss a narcotic or for the dog to miss a track or an article on the article searches, you know, that happens.

But in obedience, we never sent a canine off if the officer did not have complete control around 30 dogs, whether they were barking or not, or all kinds of stimulus [*sic*]. I mean, it's -- distractions are the key. Your dog has to listen no matter what's going on around him. Has to.

[DEFENSE COUNSEL]:     So the thing that's I guess more troubling to you, if I understand you right, isn't that the dog didn't alert. It's that there was no obedience.

[BROOKS]:    That hit me hard, yes.  I mean, it just was really interesting to me how, you know, either officer couldn't stop their dog from barking.  I mean, I just -- I was -- I couldn't get it.  I mean, I have never seen that.  I have never ever seen that, you know, where the one in the car couldn't tell its [*sic*] dog to quiet down or to lay down which stops a dog from barking 95 percent of the time."

¶ 14    Nichols was recalled and stated that he came upon the scene of the stop around 12:15 p.m.  Nichols asked Nanouski if he needed anything, and Nanouski asked him to walk his dog around the defendant's vehicle.  Nichols testified that according to protocol, he walked the dog around the car twice, which took no more than 30 to 45 seconds.  Nichols stated that he was at the scene for a total of about 15 minutes before Nanouski and the defendant left; he said his shift ended at 3 p.m. that day and he was not at the scene for hours.

¶ 15    At the close of the hearing, the circuit court announced its ruling.  In support of that ruling, the court noted the discrepancies in the testimony, but found that the stop lasted somewhere between 45 minutes to an hour-and-a-half.  The court also stated that with regard to probable cause to search the defendant's vehicle, the court believed Nanouski's statement that he smelled cannabis:

"Whether it was burnt or raw, he didn't say, didn't answer.  I agree. But then on the other hand, there's no need to pin it down too much.  Probable cause exists because of multiple reasons.  It could be burnt because it was recently smelled -- or smoked, whether it be that day or someone's spouse at a previous occasion; or whether

or not the packaging was defective and therefore, the particular

cannabis raw was seeping through.

There's nothing to show me that Officer Nanouski is not

telling the truth."

Accordingly, the court denied the defendant's motion.

¶ 16     In July 2013, defense counsel filed a motion to dismiss for constitutional violations.  The motion alleged, *inter alia*, that the defense had retained an expert who had reviewed the Utica police DVD recording and determined that it had anomalies on it.  The motion alleged that the recording had been tampered with, which was a violation of his constitutional rights.  At the hearing on this motion, the defense called Edward Primeau as an expert witness regarding the videotape.  Primeau, an audio and video expert with 30 years of experience, testified that he reviewed the Utica police DVD containing a recording of the stop of the defendant.  He also reviewed a DVD recording from Nichols' state police vehicle.  Primeau testified that the Utica DVD contained an anomaly at "location" 107; the video dropped for some unexplained reason, indicating that there was information missing from the recording.  Additionally, an anomaly existed at 3:47 to 3:51 on the recording in which a DVD menu had been superimposed, meaning that a video signal had been added to an existing video signal.  With regard to the state police DVD, Primeau stated that the recording lacked a time and date stamp, which in his experience was unexpected from a state patrol vehicle.  Like the Utica police DVD, the state police DVD contained only a portion of the stop.

¶ 17     At this point, defense counsel noted that the defense was finally in possession of what was purported to be the original VHS cassette recording from Nanouski's police vehicle.  Primeau had not reviewed that cassette yet.  The cassette was played in court and Primeau took

7

notes. His initial impression was that it was not the original tape of the stop. He noted several instances of "color bars," which were concerning. He needed to perform a more detailed analysis before commenting on what the color bars meant, but he did state the following:

> "But what I saw, especially before the Litwin stop, was a jump cut. It went right from the jeep right up until the Litwin vehicle and nowhere else on the tape did that occur where there was a jump cut like that and I could refer to that as a pause button edit. The way to create something like that would be to have a tape and put it in record and release the pause button. Usually, there's a signature there and by signature, I mean usually there's some sort of video activity that could be viewed."

The hearing was continued for approximately a week so Primeau could conduct an analysis of the videotape.

¶ 18        When the hearing resumed, Primeau testified that he had reviewed the videotape, and he explained the process he used in that review. His analysis led him to the conclusion that the videotape was not an original. With regard to his findings, he testified, *inter alia*, that at the point the Litwin stop occurs on the tape, there were at least two distinct machine signatures, meaning that another machine had recorded over material recorded by a different machine.

¶ 19        The hearing was continued after Primeau's testimony, and when the hearing resumed, Nanouski testified that he did not alter the videotape. Utica police chief Mark Wren testified that Nanouski turned the videotape over to him and that he transferred the tape to the State's Attorney's Office. He also testified that he did not alter the videotape. The parties then stipulated to the testimony of an investigator in the La Salle County State's Attorney's Office,

8

who if called would have testified that he received the videotape in question and made a DVD copy without altering it in any way.

¶ 20    Primeau was recalled and testified that the videotape had at least two and as many as four "machine signatures" on it. He opined that the recording did not contain a complete or accurate representation of what happened during the stop. On cross-examination, he agreed that the portion of the Litwin stop that was actually on the tape was complete and showed no evidence of tampering.

¶ 21    At the close of the hearing, the circuit court found that no discovery violation occurred with regard to the videotape. The court stated, "[t]here's sufficient evidence been presented here to show that the officers tendered what they had. I can't say that the tape was tampered with in any fashion or form." The court also found that no constitutional violation had occurred. Thus, the court denied the motion to dismiss.

¶ 22    Later in 2013, the defendant obtained new counsel, who filed another motion to quash arrest and suppress evidence, which alleged, *inter alia*, that the duration of the stop was unreasonably prolonged.

¶ 23    On February 7, 2014, the circuit court held a hearing on outstanding motions, including the defendant's new motion to suppress. Nanouski testified that while the recording device in his vehicle had the capability of recording audio as well as video, he did not have the equipment on his belt on that day to enable the recording of audio. The recording equipment included a monitor in the vehicle so he could see what was being recorded, and the angle of the camera could also be adjusted manually.

¶ 24    In contrast to his testimony at the prior suppression hearing, Nanouski testified that in the 10-to-11 years that his particular video recorder had been in service, it had malfunctioned

"maybe" twice. The recorder was set to turn on when he activated his emergency lights, although he could also manually start the recorder. Nanouski checked his recorder before his shift that day; it seemed to be working properly. Nanouski testified, however, that the recorder failed to record all but the end of the encounter.

¶ 25    Nanouski testified that he initiated the stop of the defendant between 11:30 a.m. and noon on March 10, 2012. He acknowledged that he wrote the warning ticket at 12:17 p.m. He stated that he "[p]retty much" smelled the scent of cannabis right away when he bent down to talk to the defendant through the window of the defendant's vehicle. He also stated that "[t]here can be" a difference in odor between burnt and raw cannabis.

¶ 26    Nanouski noticed that the defendant appeared tired when they began talking. Nanouski asked the defendant if anyone had smoked cannabis in the car, and the defendant responded in the negative. Nanouski asked whether the defendant was sure, as he could smell it. The defendant said no, but that his wife may have. The defendant refused Nanouski's request to search the vehicle, and Nanouski told the defendant he was going to search due to the smell of cannabis.

¶ 27    Nanouski also stated that Nichols arrived on the scene around five or six minutes after the stop was initiated, but then he stated that he was not sure of the time—that it could have been 8 to 10 minutes after the stop was initiated. Nichols arrived while Nanouski was running the defendant's license and information.

¶ 28    Primeau testified that he reviewed the DVD copy of the VHS recording of Nanouski's stop of the defendant, as well as the original VHS cassette. Of the approximately 15 stops on the VHS tape, the stop of the defendant was the only one that lacked a recording of the beginning through the end of the stop. Primeau opined that the DVD was not a complete representation of

10

the stop. He stated that the VHS cassette had several anomalies related to the recording of the defendant's stop. There was a "jump" at the beginning of the recorded material from the defendant's stop, and some tracking noise, which indicated that a VHS recorder had been paused. Primeau opined that there were physical and visual indicators that the recording had been paused and "maliciously changed." Primeau stated that all video cassette recorders have different signatures, "like a fingerprint." The recording of the defendant's stop had a different signature than the rest of the tape. Primeau testified that his analysis led him to the conclusion that the VHS cassette was actually a copy; that someone had intentionally recorded only a portion of the original tape onto a second VHS tape.

¶ 29    At the close of the hearing, the circuit court denied the defendant's motion to suppress, ruling that case law permits an officer to search an entire vehicle—including the trunk—when the officer smells the odor of cannabis coming from the vehicle.

¶ 30    After a trial, the defendant was found guilty of unlawful cannabis trafficking and was sentenced to 12 years of imprisonment. The defendant appealed.

¶ 31                                          ANALYSIS

¶ 32    On appeal, the defendant argues, *inter alia*, that the circuit court found that the duration of the traffic stop had not been unreasonably prolonged and erred when it denied his motion to quash arrest and suppress evidence.

¶ 33    When reviewing a circuit court's ruling on a motion to suppress, our standard of review contains two parts. *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006). First, with regard to the court's findings of historical fact, we accord those findings great deference and review them only for clear error. *Id.* Accordingly, we will disturb those findings only if they are against the manifest weight of the evidence. *Id.* Second, with regard to the court's ultimate legal ruling on

11

the motion, we accord that ruling no deference, as we "remain[] free to undertake [our] own assessment of the facts in relation to the issues and may draw [our] own conclusions when deciding what relief should be granted." *Id.* Accordingly, we review the court's ultimate legal ruling on the motion *de novo*. *Id.*

¶ 34 Traffic stops are analyzed under the familiar principles of *Terry v. Ohio*, 392 U.S. 1 (1968). *People v. Cosby*, 231 Ill. 2d 262, 274 (2008). "Under *Terry*, the reasonableness of police action taken during an investigative detention involves a dual inquiry: (1) whether the officer's action was justified at its inception; and (2) whether the officer's action was reasonably related in scope to the circumstances which justified the interference in the first place." *People v. Baldwin*, 388 Ill. App. 3d 1028, 1031-32 (2009). In this case, the defendant does not challenge the legitimacy of the stop. Thus, this appeal centers on the second prong of the *Terry* inquiry— the scope inquiry. See *id.* at 1032 (discussing case law in the context of *Terry*'s second prong).

¶ 35 Under the scope inquiry:

> "police conduct occurring during an otherwise lawful seizure does
> not render the seizure unlawful unless it either unreasonably
> prolongs the duration of the detention or independently triggers the
> fourth amendment. [Citation.] If the conduct violates either
> principle, the conduct must possess a separate fourth amendment
> justification to avoid rendering the seizure unlawful." *Id.* at 1033.

¶ 36 No question has been raised in this case that Nanouski's conduct independently triggered the fourth amendment. See *id.* at 1033-34. Thus, we review whether Nanouski's actions unreasonably prolonged the duration of the stop. In doing so, we consider the totality of the circumstances surrounding the stop, including the stop's brevity and the police officer's diligence

12

in fulfilling the purpose of the stop. *Id.* at 1034. "An officer's authority to investigate a traffic violation may not become a subterfuge in order to obtain other evidence merely based on the officer's suspicion." *People v. Koutsakis*, 272 Ill. App. 3d 159, 164 (1995).

¶ 37    The testimony in this case contained significant discrepancies, and the testimony related to the duration of the stop was no different. According to Nanouski, he initiated the stop sometime between 11:30 a.m. and noon. According to the defendant, he remembered looking at the clock in his vehicle at one point during the stop and it read 11:47 p.m. Nichols testified that he arrived on the scene around 12:15 p.m. The warning ticket issued to the defendant reflected a time of 12:17 p.m. The videotape was of no help in determining when the stop was initiated. However, according to Nanouski's own testimony, Nichols arrived on the scene around 10 minutes after the stop was initiated—while Nanouski was running the defendant's license and information. Thus, Nanouski took at least 10 minutes just to run the defendant's information for a stop due to improper lane usage that resulted in a warning ticket. While there is no bright-line rule to indicate the exact point at which the duration of a stop becomes unreasonable (*Baldwin*, 388 Ill. App. 3d at 1034), our analysis of the totality of the circumstances leads us to the conclusion that Nanouski's actions unreasonably prolonged the duration of this stop for improper lane usage that resulted in a warning ticket (see *id.* at 1034-35).

¶ 38    Given that we have ruled that Nanouski's actions unreasonably prolonged the duration of this stop, we must analyze whether those actions were separately justified under the fourth amendment. *Id.* at 1033. Here, the dispositive question centers around whether Nanouski was credible with regard to his claim that he smelled cannabis emanating from the vehicle as soon as he began talking to the defendant.

13

¶ 39    The circuit court is in a better position than a reviewing court to observe witness demeanor, resolve conflicts in the testimony, and weigh the credibility of witnesses. *People v. Gherna*, 203 Ill. 2d 165, 175 (2003). Such conclusions will be overturned only if they are against the manifest weight of the evidence, which occurs when the opposite conclusion is evident. *People v. Sims*, 358 Ill. App. 3d 627, 634 (2005).

¶ 40    In this case, even assuming that the defendant's version of events was not credible, Nanouski's testimony was highly questionable. He testified that he smelled cannabis emanating from the defendant's vehicle "pretty much" right away when he began talking to the defendant. However, he still asked the defendant for consent to search the vehicle. This action belies common sense, and Nanouski's reason for doing so ("[b]ecause I was hoping that he would say yeah, you can have a look") is no justification for taking that action. It is well settled that the smell of cannabis emanating from a vehicle is sufficient to give an officer probable cause to search the vehicle (see, *e.g.*, *People v. Stout*, 106 Ill. 2d 77, 86-88 (1985)), and presumably an officer—especially one with 27 years of experience and who has conducted thousands of stops involving cannabis—is aware of this principle.

¶ 41    Furthermore, other issues with Nanouski's testimony exist that undermined his credibility. He testified at the first suppression hearing that his recording equipment was "bad" and malfunctioned about half of the time, but at the second suppression hearing, he testified that his recording equipment had malfunctioned "maybe" twice in 10 to 11 years. His testimony regarding whether the odors of burnt and raw cannabis differed was not entirely consistent between suppression hearings. His police report stated that he asked the defendant whether anyone had smoked cannabis in the vehicle, but he testified at the first suppression hearing that he asked the defendant whether anyone had been smoking or had cannabis in the vehicle.

14

¶ 42    Several other points also must be emphasized. First, Nichols testified that he did not smell any odor of cannabis emanating from the vehicle and that his dog did not alert at the defendant's vehicle. Second, the simultaneous misbehaving of two highly trained dogs and the inability of their handlers to control them is extremely suspect, especially in light of Brooks' expert testimony regarding a dog's training even before the animal is passed on to the officer.

¶ 43    Third, the problematic nature of the videotape from Nanouski's vehicle is compelling. The defense's expert, Edward Primeau, conducted an analysis of what was purported to be the original videotape of the stop, and his findings led him to the conclusion that the videotape was in fact not an original. Primeau, whose testimony went unrebutted by the State, opined that the videotape had been manipulated and "maliciously changed." This type of malfeasance is so outrageous and morally reprehensible that it taints the entirety of the police testimony presented in this case.

¶ 44    Under these circumstances, we conclude that the circuit court's finding that Nanouski was credible is not entitled to deference, as we find that conclusion was clearly against the manifest weight of the evidence. See generally *Sims*, 358 Ill. App. 3d at 634. Nanouski was not credible with regard to whether he smelled cannabis emanating from the vehicle. In this context, absent that separate fourth amendment justification, Nanouski was not justified in prolonging the duration of this traffic stop for improper lane usage. See *Baldwin*, 388 Ill. App. 3d at 1033. Accordingly, we hold that the circuit court also erred when it denied the defendant's motion to quash arrest and suppress evidence.

¶ 45                                    CONCLUSION

¶ 46    The judgment of the circuit court of La Salle County is reversed.

¶ 47    Reversed.

15

¶ 48        JUSTICE CARTER, dissenting.

¶ 49        I respectfully dissent from the majority's decision in the present case. Unlike the majority, I would not find that the trial court's ruling was against the manifest weight of the evidence or that the opposite conclusion is evident from the record before us in the instant case.

¶ 50        I respectfully suggest that the majority's analysis is more of a *de novo* review of the trial court's credibility findings. Although there are inconsistencies in the officer's testimony, given our standard of review, I do not believe that we can find that the testimony was "highly questionable," or that it "belies common sense," even given the inconsistencies. Inconsistencies can be caused by a number of different reasons, including the failure of memory, the failure to prepare, dishonesty, and being involved in a number of these cases. I also do not think that it is unusual for a police officer under a number of circumstances to ask for consent to search a vehicle, even if the officer smells cannabis coming from the vehicle. Moreover, I do not believe that we can draw the conclusion that the action of the dogs in this case was extremely suspect.

¶ 51        Further, I cannot agree with the analysis in paragraph No. 43 of the majority's decision (*supra* ¶ 43). I would agree that if there was malfeasance, it would be outrageous and morally reprehensible. However, I do not believe that we can reach that conclusion based on the pure speculation of the defense witness, that the videotape had been "maliciously changed," which was beyond the witness's expertise and specialized knowledge. See Ill. R. Evid. 702 (eff. Jan. 1, 2011). The expert was testifying about the integrity of the cassette and the claim that it was maliciously altered goes to someone's state of mind and motive.

¶ 52        The trial court heard the cumulative evidence of the unrebutted expert testimony, the inconsistencies in the officer's testimony in the two hearings, and the testimony of other witnesses, and given the standard of review, I do not believe that we are justified in overturning

16

the trial court's ruling as being against the manifest weight of the evidence.  Therefore, I would affirm the trial court's judgment.