2021 IL App (3d) 170410

Opinion filed February 17, 2021

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2021

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 14th Judicial Circuit, Henry County, Illinois, |
|---|---|---|
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-17-0410 Circuit No. 13-CF-354 |
| | ) | |
| JOSE SANCHEZ, | ) ) | Honorable Peter W. Church, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE HOLDRIDGE delivered the judgment of the court, with opinion.
Justice Schmidt concurred in the judgment and opinion.
Presiding Justice McDade dissented, with opinion.

_____

**OPINION**

¶ 1     The defendant, Jose Sanchez, appeals his conviction for cannabis trafficking, arguing that

the court erred in denying his motion to suppress the evidence gathered following a traffic stop.

¶ 2                                    I. BACKGROUND

¶ 3     The defendant was charged with cannabis trafficking (720 ILCS 550/5.1(a) (West 2012)),

unlawful possession with intent to deliver more than 5000 grams of cannabis (720 ILCS 550/5(g)

(West 2012)), and unlawful possession of more than 5000 grams of cannabis (720 ILCS 550/4(g)

(West 2012)). The charges originated from a free-air dog sniff performed during a traffic stop on December 20, 2013.

¶ 4        The defendant filed a motion to suppress, which is the subject of this appeal, and a hearing was held on February 18, 2016. Sergeant Clint Thulen testified that on December 20, 2013, he executed a traffic stop on a rented 2013 Mercedes-Benz because he had observed the vehicle speeding. The defendant was driving the vehicle, and there was a female passenger. Thulen approached the vehicle and requested their driver's licenses and the vehicle's rental agreement. He asked the defendant to come to the squad car for a warning ticket.

¶ 5        Once at the squad car, Thulen testified that his report stated that he performed routine computer checks. He stated that this could also mean that he ran the information through the radio. Thulen stated that he did not specifically remember if he performed a computer check of the defendant and the passenger but stated that it would be very unusual for him not to do so if he had their driver's licenses in hand. He did remember that later on he called in the defendant's information in order to obtain his criminal history because such information was not easily accessible through the mobile data computer (MDC).

¶ 6        Thulen stated that a warning ticket includes the following information: (1) the district of assignment; (2) the State Police district of occurrence; (3) the location; (4) the date; (5) the time; (6) the method by which the violation was discovered; (7) the violation itself; (8) whether a warning, citation, or other dispositions occurred; (9) the name, address, date of birth, driver's license classification, and driver's license number of the driver; (10) the make, model, and year of the vehicle; (11) the actual registration; (12) the date; and (13) the signatures of the officer and the violator. Thulen stated that the majority of this information would be contained in the driver's license and registration, as well as his knowledge of the law and the conditions at the time.

2

However, for a rental car, the registration is not usually in the car. Instead, he would have to look at the rental agreement. Since the rental agreement would not contain all the necessary registration information, he would have to look it up on the MDC.

¶ 7 Thulen testified that he then began to fill out a written warning form. As he began filling out the warning, he had a lapful of documents, and he was sorting through the documents and filling in the warning. While doing so, Thulen asked the defendant where he was coming from and where he was going. He also reviewed the rental agreement to determine when the vehicle was due to be returned because, in his experience, he encountered overdue rental cars "on a very regular basis." Thulen stated that it was his job to secure an overdue vehicle for the rental company, though Thulen stated that the defendant's rental car was not overdue. Thulen reiterated that he was performing several tasks at once while the defendant was in the squad car. He was examining the two driver's licenses and the rental agreement and was writing the written warning. Thulen stated that he commonly bounced back and forth between documents. Thulen noted that the defendant had a very common name with no middle initial, so he "ran him through radio so that [dispatch] could sort out the numerous responses [he] knew that they would get." He believed that a common name would return a deluge of information associated with that name. After providing the information to dispatch, Thulen had no control over how long it took for dispatch to contact him with the return information. He was waiting for dispatch to confirm the validity of the defendant's driver's license and inform him whether the defendant was wanted or there were warrants out for his arrest.

¶ 8 At this point, Trooper James Fratzke arrived and approached Thulen's window. Thulen stated that he was unsure whether he called Fratzke for assistance. Thulen noted that his report stated that he requested Fratzke but transcripts from the messages on his MDC indicated that

3

Fratzke came to the scene because he was in the area. Thulen informed Fratzke of the reason for the traffic stop and told Fratzke that the defendant was taking his passenger from California to Lake Thunderbird. Thulen and Fratzke's conversation lasted "a matter *** of seconds," and Thulen was performing other tasks while speaking to Fratzke. Fratzke walked up to the passenger side of defendant's vehicle and remained there for about 30 seconds before approaching Thulen's squad car again. Thulen testified that his interaction with Fratzke did not distract him from his duties because, "just like in the rest of your life, you're never ever doing just one thing." Thulen stated that he was "definitely able to execute a traffic stop and do more than one thing" at a time. Thulen continued to examine the documents and made radio checks on "wants and warrants."

¶ 9        Shortly thereafter, Fratzke performed a free-air sniff with his dog. Fratzke's dog alerted on the defendant's vehicle. Thulen testified that he had been a dog handler in the past and was familiar with Fratzke's dog. Thulen had seen Fratzke's dog alert on vehicles in the past and observed the dog alert to the defendant's vehicle. Thulen observed the dog's body posture and breathing change and saw the dog lay down on the driver's side of the vehicle, which is the dog's alert position. Thulen had not received the defendant's license or warrant check results from dispatch when the dog alerted. He also did not believe that the information from the passenger had come back on the computer because, when he reviewed the dashcam video, he did not hear the sound that the computer makes when it returns the information.

¶ 10        While Thulen began writing the warning ticket on the roadside during the traffic stop, he believed that he completed the ticket at the Geneseo Police Department, though he could not recall specifically. Thulen stated that he could tell from the video that he took the warning booklet out of its metal storage box because, though the video did not capture him removing the booklet, he could hear the sound of opening and closing the metal box.

4

¶ 11    Thulen maintained that he did not attempt to delay the traffic stop. He testified that he had been a patrol officer for 25 years, and he estimated that he had performed tens of thousands of traffic stops. He estimated that the average traffic stop varies from stop-to-stop and is dependent on the type of enforcement documentation that he would be required to complete. He further estimated that, if everything went perfectly, he could complete a stop in 12 to 14 minutes. He testified that this estimate was based on the need to be careful, not make errors when filling in boxes on the citations, write legibly, and examine identity documents. Thulen testified that, after the dog alerted, he discontinued writing the warning, and he and Fratzke initiated a search of the defendant's vehicle.

¶ 12    The video from Thulen's squad car was played in open court. The video was not time stamped but was reviewed in conjunction with the time shown on the video software. The defendant's car and the squad car came to a stop at the side of the road about 30 seconds into the video. Thulen approached the passenger side window at about one minute. The defendant and the passenger initiated small talk about the weather, and then Thulen explained that he pulled the defendant over for driving 72 miles per hour in a 65-mile-per-hour zone. The defendant and the passenger gave Thulen their licenses and the rental agreement. Thulen asked the defendant to come back to the squad car for a written warning. Thulen got into the squad car and then cleaned off the passenger seat. In doing so, he put a metal box on his lap and put the rest of the stuff in the back seat. The defendant got into the car at about 3 minutes. Thulen made some movements and then put the metal box in the back. While putting the box in the back, Thulen asked where the defendant was headed, and the defendant said Lake Thunderbird. Thulen shuffled papers, and then he asked the defendant if he still lived at the address listed on his license. The defendant said that he did. Thulen asked if the defendant knew where the passenger lived, and the defendant said he knew the

5

street but not her address. Thulen then asked if she was his girlfriend. The defendant stated that he was married, and he was doing his wife a favor by giving her friend a ride because she did not like to fly. Thulen asked the defendant who "Jacqueline" was, and the defendant stated that she was his wife and that she rented the car. While talking to the defendant, Thulen appeared to be moving his arms and looking at the documents. At this point, about 5 minutes into the video, Fratzke arrived and approached the squad car. Fratzke then approached the defendant's vehicle. Slightly before 6 minutes, Thulen asked when the vehicle had to be returned. He then radioed the defendant's information into dispatch. He spoke with dispatch until about 7 minutes and 20 seconds on the video. During this time, Fratzke performed the dog sniff, and the dog alerted around 7 minutes and 38 seconds. The entire of the interaction from when the cars were stopped to when the dog alerted was approximately 7 minutes and 8 seconds. Thulen described the rustling and shuffling heard in the video as noise that was made as he reviewed the rental agreement, pulled the warning booklet out of the metal box, and removed the written warning from a cardboard preprinted perforated booklet.

¶ 13        Thulen was asked several questions about the radio logs from his squad car. Approximately two minutes into the traffic stop, Thulen informed dispatch that he was engaged in a traffic stop, which triggered a safety protocol for dispatch to contact him in five minutes if he did not contact dispatch first. About 6 minutes and 20 seconds into the traffic stop, Thulen called to dispatch and said, "Secure 30 minutes." Thulen stated that this action was to inform dispatch that it did not need to check on him for 30 minutes. Thulen anticipated that he was going to spend more time on the scene with the defendant "because of things that [he] had already seen." Thulen acknowledged that, at the time he sent the dispatch, the dog had not yet alerted. Thulen stated that he called in the "Secure 30" because, based on his training and experience, he had already encountered facts very

6

similar to this traffic stop in the past, and he knew there was a likelihood that criminal activity was afoot. However, Thulen said that the fact that he asked for a "Secure 30" did not indicate that he intended to keep the defendant at the scene for 30 additional minutes.

¶ 14          Fratzke testified that he assisted Thulen on the morning of December 20, 2013. He had been a trooper with the Illinois State Police for 20 years. He did not remember if Thulen called him but stated that he was in the area when Thulen made the stop and part of his normal routine was to assist other officers during traffic stops. After Fratzke arrived on the scene, Thulen gave him information regarding the stop. At this point, Fratzke had not seen anything suspicious. Fratzke testified that he then approached the defendant's vehicle and informed the passenger that he was going to perform a free-air sniff with his dog. Fratzke also asked the passenger about her destination and who had rented the vehicle. Fratzke wanted to compare the information provided by the passenger with the information the defendant provided to Thulen. Fratzke then performed a dog sniff of the vehicle, and the dog alerted. The defendant was still in the squad car with Thulen when the dog alerted.

¶ 15          Fratzke testified that he had made numerous traffic stops in his career, and it typically took him three to five minutes to write a warning citation but that was only to actually fill in the paperwork. However, Fratzke stated that conducting the entire traffic stop would take more than three to five minutes. He stated that the entire traffic stop included (1) stopping the vehicle; (2) explaining to the occupants why they were stopped; (3) receiving their identification, insurance, and registration; (4) returning to the squad car; (5) completing the driver's license, license plate, and wants and warrants checks; (6) filling out the documents; and (7) explaining the citation or warning to the offender. He stated that it sometimes takes 10 minutes for information to come back when he does a want and warrant check.

7

¶ 16    The defendant testified that Thulen stopped him for speeding. Thulen asked the defendant for his driver's license and the car rental agreement and also asked the defendant's passenger for her driver's license. Thulen asked the defendant to sit in his squad car, and the defendant complied. The defendant stated that Thulen took the paperwork the defendant provided him back to his squad car, and Thulen reviewed the rental agreement paperwork while the defendant sat in the squad car with him. In the squad car, Thulen asked the defendant where he was going and where he had come from. Thulen verified the defendant's address as well as the passenger's address. The defendant stated that Thulen entered information on the computer and asked for the defendant's social security number. At the same time, Thulen was using his cell phone. The defendant observed Thulen performing those tasks when Fratzke arrived at the scene. The defendant testified that he never saw Thulen writing a warning ticket. He never saw Thulen put pen to paper or take a warning ticket out of a box. He was never given a warning ticket.

¶ 17    At the conclusion of the hearing, the parties were unaware if there was a copy of the warning ticket. The court stated that it would take the matter under advisement. However, the parties subsequently located a copy of the warning ticket, and the hearing was reopened on July 11, 2016.

¶ 18    The warning ticket was admitted into evidence. Thulen was again called to testify and stated that he began drafting the written warning in his squad car while the defendant was seated in the front passenger seat. The warning indicated that the defendant was speeding, traveling 72 miles per hour in a 65-mile-per-hour zone. The warning contained the defendant's name, gender, address, and driver's license number and the make and model of the vehicle. The document showed that Thulen initially began to write the wrong driver's license number onto the warning, and he struck out the entry with a line and wrote the correct number. Thulen testified that he had been

8

working on the warning ticket in the squad car but stopped working on it when Fratzke's dog alerted to the presence of narcotics. Thulen stated that once the dog alerted, his focus transitioned to searching the vehicle and processing the contraband. He stated that he would have completed the ticket either at the Geneseo Police Department or when he completed his police report. It was not out of the ordinary to finish a citation at the police department when the traffic stop was not an ordinary traffic stop. Thulen did not believe it was possible that he wrote the entire warning at the Geneseo Police Department.

¶ 19    While he would normally provide a copy to an offender defendant, he did not recall giving the defendant a copy of the written warning, here. Thulen testified that the written warning was not presented to the defendant because he was in custody. Thulen had noted on the written warning that the defendant was in custody since the defendant had already been placed in handcuffs. He stated that there is no protocol or policy requiring a written warning to be signed by the driver or handed to the driver and that, once a defendant is in custody, a written warning is placed amongst the paperwork to be quality checked. He testified that he sometimes leaves a copy with an offender but did not do so here because the defendant was taken to the jail by another officer after the defendant participated in an attempted controlled delivery in Chicago subsequent to the stop. Thulen did not recall when he finished the warning ticket at the police department.

¶ 20    The defendant testified, again, that he did not see Thulen writing a written warning while the defendant was in the squad car. Moreover, he was never given a copy of the warning and had never seen it. The defendant stated that Thulen drove him to the Geneseo Police Department. Once there, the defendant met with other officers, but Thulen was not with him at the police department.

¶ 21    The court issued a written ruling on November 29, 2016. In its ruling, the court found that the squad car video was not dispositive of whether the drafting of the warning began in the squad

9

car or was fully drafted at the Geneseo Police Department. Based on the hearing testimony, however, the court believed the warning was written entirely at the police department. The court found Thulen's testimony to be equivocal on the issue, and the defendant's testimony on the issue to be credible. The court found that the free-air sniff "delayed the stop to some degree." The court then addressed whether exclusion of the evidence was required. The court stated that the stop would have been unconstitutional and subject to suppression if it had been conducted after *Rodriguez v. United States*, 575 U.S. 348 (2015), was decided. The court found that the issue was whether the good faith exception to the exclusionary rule applied in this case. It noted that the good faith exception applied when a search was conducted by a police officer who relied upon binding judicial precedent. The court stated:

> "Under prior Illinois precedent an Illinois police officer would reasonably believe that he or she could conduct a free air dog sniff during an unrelated investigatory stop provided that the delay occasioned by the sniff did not unreasonably prolong the investigatory stop. Officers following this procedure prior to *Rodriguez* would be acting in good faith in relying on this precedent."

The court held that Thulen's conduct fell under the good faith exception and denied the motion to suppress.

¶ 22 Following a bench trial, the defendant was found guilty on all three counts. The offenses merged, and he was sentenced to the statutory minimum sentence of 12 years' imprisonment for cannabis trafficking. The court granted an appellate bond during the pendency of this appeal.

¶ 23                                II. ANALYSIS

¶ 24 On appeal, the defendant argues that the court erred when it denied his motion to suppress. Specifically, the defendant argues that Thulen impermissibly prolonged the seizure beyond the time reasonably required to complete the mission of the traffic stop.

¶ 25 A reviewing court applies a two-part standard of review to rulings on motions to quash arrest and suppress evidence. *People v. Hopkins*, 235 Ill. 2d 453, 471 (2009). On review, we give great deference to the trial court's factual findings and will reverse those findings only when they are against the manifest weight of the evidence. *People v. Sorenson*, 196 Ill. 2d 425, 430-31 (2001). A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or the finding itself is unreasonable, arbitrary, or not based on the evidence. *People v. Deleon*, 227 Ill. 2d 322, 332 (2008). However, a reviewing court remains free to undertake its own assessment of the facts in relation to the issues and may draw its own conclusions when deciding what relief should be granted. *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006). Accordingly, the trial court's ultimate legal ruling as to whether suppression is warranted is reviewed *de novo*. *Id.*

¶ 26 At the outset, we note that the State acknowledges that the trial court erred in holding that Thulen's actions were protected by the good faith exception to the exclusionary rule regarding traffic stops. The court held that the good faith exception applied because the officers relied on precedent established before *Rodriguez* was decided. However, the defendant and the State point out, and we agree, that *Rodriguez* did not create new law but merely restated precedent established in *Illinois v. Caballes*, 543 U.S. 405, 407 (2005), which was in effect at the time of the traffic stop, here. Therefore, the court erred in holding that the good faith exception applied.

¶ 27 Nonetheless, the State maintains that the trial court properly denied the motion to suppress and notes that a court's ruling can be sustained for any reason supported by the record. *People v.*

11

*Williams*, 2019 IL App (3d) 160132, ¶ 15 (noting that the reviewing court looks at the trial court's judgment, not its reasoning, and can affirm on any basis).

¶ 28        A police officer may stop and briefly detain a motorist when the officer has observed the motorist committing a traffic offense. *People v. Abdur-Rahim*, 2014 IL App (3d) 130558, ¶ 26. However, the traffic stop can become unlawful if it is prolonged beyond the time reasonably required to complete the seizure's mission. *People v. Reedy*, 2015 IL App (3d) 130955, ¶ 25. Authority for the seizure "ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez*, 575 U.S. at 354. The seizure's mission consists of the purpose of the stop and related safety concerns. *People v. Cummings*, 2016 IL 115769, ¶ 13. The related safety concerns comprise of " ' "ordinary inquiries incident to the [traffic] stop," ' " including (1) checking the driver's license, (2) determining whether there are any outstanding warrants against the driver, (3) checking the driver's criminal history, and (4) inspecting the vehicle's registration and proof of insurance. *Id.* ¶¶ 13, 17 (quoting *Rodriguez*, 575 U.S. at 363 (Kennedy, J., dissenting), quoting *Caballes*, 543 U.S. at 408). These inquiries serve two mission-related objectives: officer safety and "ensuring that vehicles on the road are operated safely and responsibly." *Rodriguez*, 575 U.S. at 355.

¶ 29        A dog sniff is not an ordinary incident of a traffic stop. *Id.* Nonetheless, a dog sniff conducted during a lawful traffic stop does not trigger the fourth amendment so long as it does not prolong the duration of the stop. *Caballes*, 543 U.S. at 407-08. When determining whether the stop was prolonged beyond the time reasonably required to complete the mission of the stop, we consider the totality of the circumstances, looking specifically at the duration of the stop and the officer's diligence in fulfilling the purpose of the stop. *People v. Litwin*, 2015 IL App (3d) 140429, ¶ 36.

12

¶ 30    First, we consider the duration of the stop. The parties agree that the stop lasted slightly over 7 minutes, from the time both the defendant's vehicle and the squad car were fully stopped to the time that the dog alerted on the vehicle. Thulen and the defendant entered the squad car approximately 2½ minutes into the stop. Fratzke and the dog arrived 2 minutes later, approximately 4½ minutes after the stop started. The defendant admits that the stop was brief, and we agree. The duration of the stop was shorter than many stops that have been upheld. See *Reedy*, 2015 IL App (3d) 130955, ¶ 33 (traffic stop lasted less than 10 minutes); *People v. Canizalez-Cardena*, 2012 IL App (4th) 110720, ¶ 18 (stop lasted 10 to 12 minutes to issue a warning ticket); *People v. Wofford*, 2012 IL App (5th) 100138, ¶ 30 (17 minute stop); *People v. Staley*, 334 Ill. App. 3d 358, 367 (2002) (duration of stop was 18 minutes); *People v. Perez*, 288 Ill. App. 3d 1037, 1045 (1997) (12 minute stop).

¶ 31    However, the duration of the stop is not the only factor, and we next look at whether Thulen acted diligently in fulfilling the purpose of the stop during those seven minutes. As stated above (*supra* ¶ 29) the mission of a traffic stop includes deciding whether to administer and, if so, writing a warning or ticket but also includes ordinary inquiries, such as (1) checking the driver's license, (2) determining whether there are any outstanding warrants against the driver, (3) checking the driver's criminal history, and (4) inspecting the vehicle's registration and proof of insurance. During the brief traffic stop, Thulen acted with diligence in performing each of these inquiries. He received both the defendant's and the passenger's driver's licenses. Both Thulen and the defendant testified that Thulen ran the license information through his computer. Thulen called in to conduct a check on the defendant's criminal history, which had not been returned by the time the dog alerted. Since the vehicle was a rental, Thulen had to review the rental agreement in order to determine the propriety of the registration and insurance. As the defendant's name was not listed

13

on the rental agreement, it was necessary for Thulen to ask some additional questions. As Thulen stated, he was asking questions while reviewing the documents and performing a computer search. This appeared to be confirmed by the video, where Thulen is shuffling papers.

¶ 32    While the defendant contends that the trial court's finding that Thulen wrote the entire warning ticket at the police department is dispositive of this issue, we disagree. Putting pen to paper to complete the warning is only one step. Whether Thulen had started physically writing the ticket or not, he was gathering the information necessary to do so. Moreover, in *People v. Heritsch*, 2017 IL App (2d) 151157, ¶ 13, the Second District stated, "If drugs are detected at a time when the officer would otherwise still have been writing a ticket, we fail to see how, at that point, any time has been added to the stop." *Heritsch* relied on our decision in *Reedy* and stated that there must be evidence that, but for activities unrelated to the mission of the stop, the officer would have finished writing the warning and delivered it to the defendant before the dog alerted. *Id.* (citing *Reedy*, 2015 IL App (3d) 130955, ¶ 32). There is no evidence that Thulen would have finished writing the warning before the dog alerted. The defendant maintains that Thulen should have been able to conduct the necessary inquiries and write the warning within "a minute or two." The defendant does not provide any support for this, and such a contention belies reason. During the short nature of the stop, Thulen was performing the necessary inquiries and tasks. This was not a case where an officer was stalling in order to wait for a narcotics dog to arrive or to otherwise develop probable cause to search the defendant's vehicle. See *Reedy*, 2015 IL App (3d) 130955, ¶ 33. Considering the brevity of the stop and the diligence of Thulen in conducting the necessary inquiries and obtaining the information necessary to write the warning ticket, we find that the traffic stop was not unreasonably prolonged.

¶ 33    In coming to this conclusion, we reject the defendant's contention that asking the defendant where he was coming from and where he was going was unrelated to the mission and prolonged the stop. We cannot say that such questioning was necessarily unrelated to the mission of the stop. Such questions can easily be used to determine whether the driver was coming from a bar and was intoxicated or was rushing to get to the hospital, which could help the officer determine whether to issue a warning or citation. Even accepting that the questioning was unrelated to the mission, asking questions unrelated to the purpose of the seizure is not unlawful as long as the questioning does not extend the time the defendant was detained. *Reedy*, 2015 IL App (3d) 130955, ¶ 32 (citing *Muehler v. Mena*, 544 U.S. 93, 101 (2005), and *Arizona v. Johnson*, 555 U.S. 323, 333 (2009)). Here, the questioning was brief and was conducted while Thulen was conducting other activities, like reviewing the documents provided. The video showed that Thulen asked the defendant where he was going while still clearing off the passenger seat.

¶ 34    We also reject the defendant's reliance on *People v. Cassino*, 2019 IL App (1st) 181510, for the proposition that Thulen could not ask the defendant about the rental car agreement. The crux of *Cassino* is that the officer called the rental car company, which extended the stop by 25 minutes. *Id.* ¶ 66. The *Cassino* court noted that the officer could have questioned the defendant to determine whether he had permission to drive the car from the lessee but had failed to do so. *Id.* ¶ 64.

¶ 35    We would be remiss if we did not respond to the dissent's claim that this reasoning "trivializes the priority of the traffic mission identified and reinforced in *Rodriguez* and *Caballes*." *Infra* ¶ 47. As stated above (*supra* ¶¶ 28-33), our disposition follows the established caselaw. The only case the dissent cites in which a dog sniff was actually suppressed is *Litwin*, where the suppression was based on incredibility and potential misconduct, as opposed to an unduly

15

prolonged stop. *Litwin*, 2015 IL App (3d) 140429, ¶¶ 40-43 (suppressing the dog sniff where the two police dogs misbehaved, an expert testified that the videotape had been "maliciously changed," and the officer was not credible). Moreover, neither *Rodriguez* nor *Caballes* support the dissent's conclusion that Thulen was solely pursuing drug interdiction and sacrificed the mission of the stop. In *Caballes*, the dog sniff was upheld. *Caballes*, 543 U.S. at 410; *People v. Caballes*, 221 Ill. 2d 282 (2006). The dog sniff in *Rodriguez* was ultimately upheld as well, albeit on other grounds (*United States v. Rodriguez*, 799 F.3d 1222 (8th Cir. 2015)). Nonetheless, the facts of *Rodriguez* are very different than the facts we have here. In *Rodriguez*, the officer pulled the defendant over at 12:06 a.m. and fully finished the stop, including issuing a written warning and returning the defendant's documents, by 12:28 a.m. *Rodriguez*, 575 U.S. at 351-52. Thus, 22 minutes had elapsed since the beginning of the stop. Though the stop was fully completed, the officer told the defendant to get out of the car, and they stood and waited for five minutes for another officer with a dog to arrive. *Id.* at 352. The stop was clearly unduly prolonged where the traffic stop was fully completed and the officer was not conducting any mission-related tasks. *Id.* at 357-58. Here, the stop was only seven minutes before the dog alerted, and Thulen was completing mission-related tasks.

¶ 36                                    III. CONCLUSION

¶ 37          The judgment of the circuit court of Henry County is affirmed.

¶ 38          Affirmed.

¶ 39          JUSTICE McDADE, dissenting:

¶ 40          The majority affirms the ruling of the trial court denying defendant Sanchez's motion to suppress evidence. I would find that the trial court's credibility and factual determinations in this case establish a timeline of events that reveals a diligent and focused drug interdiction investigation

16

unrelated to the ostensible mission of the traffic stop and compels the opposite result. I, therefore, respectfully dissent.

¶ 41        This case, like many seen by this court, involves an officer, trained in drug interdiction, who stopped a motorist for speeding not to protect the safety of others using the highway but rather to find and confiscate illegal drugs. During his suppression hearing, Sanchez testified that, based on his personal observation while he was seated in the back of Thulen's squad car answering drug interdiction questions, Thulen never took any actions toward writing the warning citation. The trial court found Sanchez's testimony on this matter credible. *People v. Caballes*, 221 Ill. 2d 282, 289-314 (2006) (" '[W]hen a trial court's ruling on a motion to suppress evidence involves factual determinations and credibility assessments,' the ruling will not be disturbed on appeal unless it is manifestly erroneous." (quoting *People v. Sorenson*, 196 Ill. 2d 425, 431 (2001))). In fact, the trial court opined that the entirety of the warning ticket was written at the Geneseo police station after Sanchez was arrested and taken there for booking.

¶ 42        The majority contends that the trial court's finding that Thulen wrote the entire warning citation at the police department is not dispositive of the issue of officer diligence. Rather, they rationalize, putting pen to paper to complete the warning citation is *only one step*, and whether Thulen started writing the warning citation or not, he was gathering the necessary information to do so. I might agree with the majority on that except that, at its core, it is untrue. The information he was gathering was aimed at confirming his suspicion that Sanchez was doing something drug related. He had clocked Sanchez driving seven miles per hour over the speed limit; he had secured Sanchez's driver's license, proof of insurance, and the vehicle registration. However, he made no effort to confirm their validity, which would have revealed any outstanding warrants, until after Fratzke arrived at the scene. Put more pertinently, seven minutes had already elapsed before he

17

took the most fundamental steps toward verifying the information necessary to complete the traffic citation. So, while I agree with the majority that the true issue in this case is not Thulen's failure to put pen to paper, that fact does not justify affirmance of the trial court's decision. Thulen's failure to begin writing Sanchez's warning citation is merely an effect attributable to the true issue of diligence in this case, which is that Officer Thulen made drug interdiction his primary mission while the traffic mission of the stop became secondary, causing a violation of Sanchez's fourth amendment rights. See *Rodriguez v. United States*, 575 U.S. 348, 349 (2015); *Illinois v. Caballes*, 543 U.S. 405, 408 (2005).

¶ 43        As stated by the majority, the mission of a traffic stop is twofold, encompassing the traffic violation at issue and officer safety. *Cummings*, 2016 IL 115769, ¶ 13. An officer must act reasonably when completing the mission of the traffic stop, and we must consider the totality of the circumstances, including the duration of the stop and diligence of the officer, in fulfilling that mission. *Litwin*, 2015 IL App (3d) 140429, ¶ 36.

¶ 44        In this case, Thulen was patrolling I-80 as part of his drug interdiction duties when he stopped Sanchez for driving 72 miles per hour in a 65-miles-per-hour zone. Upon approaching Sanchez's vehicle, Thulen requested the rental car agreement, vehicle registration, and driver's licenses of both Sanchez and his passenger, and he requested that Sanchez accompany him to his squad car for a warning ticket to be completed. As Sanchez sat in the back of Thulen's police vehicle, Thulen, holding a "lapful" of documents, asked him numerous questions. Specifically, Thulen asked Sanchez (1) where he was coming from and going; (2) when the rental car was due to be returned; (3) the identity of the individual listed as the renter of the vehicle; (4) who he was driving with; (5) how long he intended to be in Illinois; (6) where he lived; and (7) whether there

18

was anything illegal in the vehicle. None of these questions related to the alleged traffic offenses or to officer safety. They were solely related to his drug interdiction efforts.

¶ 45    A little over five minutes after the traffic stop began, another officer, Fratzke, arrived. Six minutes into the stop, Thulen asked dispatch to "secure 30," indicating that they did not need to check on him for at least another thirty minutes. Even then, already nearly halfway through the "normal" duration of a traffic seizure, he did not ask dispatch about Sanchez's license or outstanding warrants. Thulen later testified that his training and experience told him—even without a free-air K-9 sniff, without detecting any odor of cannabis, without seeing any drugs or drug paraphernalia—that this randomly selected motorist was engaged in criminal behavior. At around seven minutes into the stop Fratzke engaged his police K-9 in a free-air sniff of Sanchez's vehicle and the dog alerted to the presence of drugs. Thulen's own timeline of events reveals that he actively performed only drug interdiction tasks for seven minutes prior to engaging in the mission of the traffic stop. Specifically, he asked Sanchez to accompany him to his squad car where he plied him with drug interdiction questions and failed to contact dispatch to obtain information regarding Sanchez's driver's license and warrant search until *after* Officer Fratzke arrived with his K-9. Indeed, the trial court concluded that Thulen had prepared the warning citation *in its entirety* at the police station long after his traffic business had ended.

¶ 46    Here, the timeline of events unequivocally demonstrates that Officer Thulen diligently pursued a mission of drug interdiction and completely sacrificed the mission of the traffic stop in the process. However, the majority has dismissed this timeline of events as a nonissue in this case, effectively negating the diligence requirement that protects the rights of motorists. In essence, the majority's decision elevates "drug interdiction" to the status of primary and authorized mission of a traffic stop. Continuing with the majority's logic, so long as an officer has taken *some* minuscule

measure of mission-related steps during a traffic stop (such as merely requesting a motorist's driver's license and registration) and has not allowed the stop to exceed a "reasonable duration," drug interdiction tasks can supplant an officer's traffic-related diligence. It is worth noting that under these circumstances the "reasonable duration" does not include even the most fundamental tasks of the traffic mission.

¶ 47        The majority's analysis trivializes the priority of the traffic mission identified and reinforced in *Rodriguez* and *Caballes* and virtually obliterates the recognition in those cases that the fourth amendment's protection of citizen rights in traffic seizures is best safeguarded when police officers are required to carry out their traffic mission with diligence and dispatch. For these reasons, I dissent.

**No. 3-17-0410**

| | |
|---|---|
| **Cite as:** | *People v. Sanchez*, 2021 IL App (3d) 170410 |
| **Decision Under Review:** | Appeal from the Circuit Court of Henry County, No. 13-CF-354; the Hon. Peter W. Church, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Peter A. Carusona, and Andrew J. Boyd, of State Appellate Defender's Office, of Ottawa, for appellant. |
| **Attorneys for Appellee:** | Matthew Schutte, State's Attorney, of Cambridge (Patrick Delfino, Thomas D. Arado, and Nicholas A. Atwood, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |