2022 IL App (2d) 200557-U
No. 2-20-0557
Order filed April 19, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Boone County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 18-CF-396 |
| LAMONT MAYBON, | ) ) | Honorable C. Robert Tobin III, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Justices McLaren and Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Trial counsel was not ineffective for failing to argue in a suppression motion that the trooper unreasonably prolonged the traffic stop, where such argument would not have prevailed.  Affirmed.

¶ 2    After a bench trial, defendant, Lamont Maybon, was convicted of one count of possession with intent to deliver a controlled substance (cocaine) (720 ILCS 570/401(a)(2)(B) (West 2020)) and two counts of possession of a controlled substance (cocaine) (720 ILCS 570/402(a)(2)(B) (West 2020)) and cannabis (720 ILCS 550/4(d) (West 2020)).  The trial court sentenced defendant to concurrent terms of 10 and 3 years' imprisonment for possession with intent to deliver a

controlled substance and possession of cannabis, respectively. Defendant moved for a new trial, and the court denied the motion. Defendant appeals, arguing that trial counsel was ineffective for failing to argue in a motion to suppress that the traffic stop was improperly prolonged. We affirm.

¶ 3                                I. BACKGROUND

¶ 4                         A. Probable Cause Affidavit

¶ 5      In his probable cause affidavit, Trooper Greg Melzer stated that, on November 13, 2018, at about 12:22 p.m., he stopped a white Chevrolet Malibu for speeding at 75 miles per hour in a 70-mile-per-hour zone on I-90. Andre Jackson was the driver, and defendant was a front passenger. Melzer spoke to Jackson, and Jackson could not provide the destination of his trip, and defendant provided a conflicting story and could not provide Sergeant Benson the name of the aunt whom Jackson and defendant were going to visit. Trooper Alan Taylor and K-9 "Bart" arrived on the scene, and the K-9 performed a free-air sniff of the vehicle, which resulted in a positive alert. Upon searching the vehicle, the troopers located 134.4 grams of suspected cocaine and 466.7 grams of suspected cannabis concealed in a natural void under the vehicle's center console cup holders. They also located three cell phones, two of which were neither Jackson's nor defendant's (but which they claimed belonged to them). After being Mirandized, both Jackson and defendant continued to provide conflicting and false information about their trip.

¶ 6                          B. Videotape of Stop

¶ 7      A videotape of the traffic stop shows what is visible in front of Trooper Melzer's vehicle. At 12:20 p.m., Melzer pulled Jackson and defendant over. He approached the passenger side of the vehicle and told Jackson that he was stopped because he was travelling 75 miles per hour. Jackson replied, "I thought it was over five." Melzer replied that he was going to write him a warning. He requested identification and asked, "Where are you two headed today?" Jackson

replied, "Going home." When Melzer asked, "Where's home at?", Jackson's reply is not intelligible. Jackson provided his identification and confirmed to Melzer that the information was correct. Melzer asked Jackson to come back to his car while he processed the warning. Jackson followed Melzer.

¶ 8    While in Trooper Melzer's vehicle, Melzer asked Jackson where in Wisconsin he was headed, and Jackson replied, "Uh, close to Madison." He stated that he had been there for "maybe a few months." Jackson explained that his "auntie" had a house there, and he would put the address in his GPS in order to drive there. Melzer asked why he moved there, and Jackson responded that he and his aunt moved to get away from the city. Melzer stated that Jackson should obtain a Wisconsin license if he is living there. Jackson replied, "I haven't been there that long."

¶ 9    Trooper Melzer asked Jackson if the vehicle belonged to him. Jackson replied that it belonged to a girlfriend. Melzer then informed Jackson that he had a warrant. He also asked how long Jackson was going to stay "up there," but Jackson's reply is muffled on the video. They discussed speeding and why police write warnings.

¶ 10    Trooper Taylor approached the passenger side of Jackson's vehicle at 12:26:03 p.m. and spoke to defendant. Melzer asked Jackson who the passenger was in his vehicle, and Jackson stated that they were cousins. Melzer then stated that Jackson "popped back valid," so he could write a warning. He asked if Jackson was staying in Madison or a town outside it, and Jackson replied that he was "not sure but she was in South Perry." At 12:27:24 p.m., Trooper Taylor approached Melzer's vehicle with what appears to be an identification card. Jackson stated that he was glad Melzer told him about speeding because he sometimes exceeded the speed limit. Melzer asked if the passenger was staying with Jackson in Madison, and Jackson replied, "no, he's

just my cousin." Jackson stated that he was "back and forth" and still needed to find "a place." Melzer stated, "he's got a valid license too it looks like, everything's clear on him, too."

¶ 11 At 12:29:13 p.m., Trooper Taylor, with his K-9, approached Jackson's vehicle to conduct a free-air sniff. Jackson asked, "What's this?" Melzer replied, "Oh, that's my partner he's got a K-9." Melzer asked Jackson if there was any reason the K-9 would alert on the vehicle and asked if he "smoked weed in there or anything like that." Jackson replied, "no." At 12:29:20 p.m., the K-9 alerted by the rear passenger door. Taylor walked back toward Melzer, and Melzer greeted Taylor and asked Jackson again if there was any reason the K-9 would have alerted to drugs in the vehicle. Jackson replied, "No sir." Between 12:32:00 p.m. and 12:32:45 p.m., Melzer stated that he would print out the written warning for Jackson and get him on his way in "one sec."

¶ 12 At 12:33:04 p.m., Melzer exited his vehicle and walked to defendant and, at 12:33:53 p.m., asked him to step out of the car to be patted down since the K-9 alerted to the smell of narcotics from the vehicle. Melzer patted defendant down and stated he could smell weed on him. Another officer escorted defendant toward the squad cars. Taylor got into Jackson's vehicle and moved it further away from the lanes of traffic.

¶ 13 Between 12:35:52 p.m. and 12:40:42 p.m., Troopers Melzer and Taylor searched Jackson's vehicle. Jackson, while still in Melzer's vehicle, yelled, "Oh man, fuck!" After the search, Melzer asked Jackson to exit his car and told him that he was being arrested for possession of a controlled substance. Jackson was placed in the back of Melzer's car. After officers secured Jackson's vehicle, Melzer drove away from the scene with Jackson in the back seat of his car.

¶ 14 C. Defendant's Motion to Suppress

¶ 15 Defendant, represented by private counsel, moved to suppress evidence, arguing that police lacked probable cause to stop the vehicle in which defendant was a passenger, to arrest defendant,

or to search the vehicle. He argued that all of the evidence gathered as a result of the illegal arrest and search should be suppressed.

¶ 16    At a June 7, 2019, hearing on the motion, Trooper Melzer testified that, around noon on November 13, 2018, he pulled over a white Chevy operated by Jackson. Melzer had first observed the vehicle while completing another traffic stop on the right shoulder on westbound I-90 at milepost 22½. Jackson's vehicle drove in the lane adjacent to the right shoulder. The speed limit was 70 miles per hour, and Jackson's vehicle appeared to be travelling faster than the speed limit. After Melzer activated his rear emergency lights, most vehicles moved out of the lane, but Jackson's vehicle did not move. This caught Melzer's attention as being unusual. Eventually, Jackson's vehicle changed lanes about 100 feet before it passed Melzer's vehicle.

¶ 17    Trooper Melzer's moving radar reflected that Jackson's vehicle's speed was 75 miles per hour. Melzer drove from the right shoulder into lane three (*i.e.*, the rightmost lane of the westbound traffic lanes), and, when he caught up to Jackson's vehicle and was directly behind it, his radar showed that the vehicle had slowed to 60 miles per hour. Melzer pulled over the vehicle for traveling 75 miles per hour when the speed limit was 70 miles per hour.

¶ 18    Prior to approaching the vehicle, Melzer ran the license plate and learned that there were no warrants, hits, etc. "It was clear and valid." When he approached the passenger side of Jackson's vehicle, he came into contact with defendant, who was reclined in the front passenger seat. Defendant had his hands on his lap and appeared "normal." He made no furtive movements.

¶ 19    Trooper Melzer directed his questions to Jackson, the driver. He asked for his license and proof of insurance, which Jackson provided, and asked Jackson to accompany him back to his unmarked vehicle. Jackson followed Melzer and sat in the front passenger seat of Melzer's vehicle. Melzer ran the information and did not learn anything unusual about the license or

insurance. "He was valid, clear." Melzer did not write Jackson a ticket but began to issue a warning. When asked why he had Jackson sit in the front passenger seat of his car, Melzer replied, "It's what I do." He asks the majority of people he stops to do this, given the nature of his assignment. Melzer attempts to determine whether someone is committing a crime other than speeding. He also asks people to exit their vehicles so that he can speak to them about their travel plans. Melzer also found it "suspicious" that Jackson's vehicle slowed to 60 miles per hour after driving 75 miles per hour.

¶ 20    Melzer further explained that he had Jackson sit in his car because he wanted to have a conversation with him about his traffic violation, his driver's license, and to ask any questions about where he was living. "If I can't run a name, it's much safer for me personally if he's sitting in the front passenger seat with me than it is for me to walk back and forth on the side of the road. Seeing as how 16 troopers have been struck this year, I'd rather not be out of my vehicle. I'd rather be in my vehicle if possible."

¶ 21    Trooper Melzer asked Jackson whether his license address was the same as his current address. He also asked about Jackson's travel plans, the point of which was to have a casual conversation between himself and the driver. The casual conversation lasted about two minutes. Jackson sat in Melzer's vehicle for about five or six minutes. Afterwards, Melzer did not give Jackson the warning ticket, "because a lot of stuff happened between those two occurrences there," specifically, Trooper Taylor arrived on the scene in case Melzer needed assistance. Taylor arrived within one or two minutes after the stop. Melzer did not call for him to come.

¶ 22    After Trooper Taylor arrived, Melzer sent him a computer messages, asking him to speak to defendant to obtain his travel plans. "[T]hen we could compare the stories between the driver and passenger." Melzer explained that his job on the criminal patrol team is to locate criminal

activity on the highways. Taylor was on his team. If the driver and passenger had conflicting stories, then Melzer would investigate to determine if there was criminal activity.

¶ 23 After Trooper Taylor spoke to defendant, he returned to his squad car and sent Melzer a message about what defendant had said to him. Taylor informed Melzer that defendant stated that he and Jackson were traveling to Wisconsin to visit Jackson's aunt. He did not know where in Wisconsin they were going, how long they were going to be there, or what else they were going to do besides visiting the aunt.

¶ 24 After receiving Taylor's message, Melzer sent a message back to Taylor, asking him if he would deploy his K-9 for a free-air sniff of the vehicle. This occurred about seven or eight minutes after Jackson's vehicle drove to stop on the shoulder. Melzer believed that criminal activity was afoot in the vehicle because of the conflicting stories between Jackson and defendant and Jackson's actions while in Melzer's car. "All that taken into totality would lead me to believe that there was possible criminal activity afoot." Trooper Melzer testified that Jackson did not know to which town they were traveling in Wisconsin. This led Melzer to suspect that Jackson was fabricating the story.

¶ 25 The K-9 alerted positive to the vehicle, and Melzer removed defendant from the vehicle. Taylor and Master Sergeant Benson, who had arrived a short time afterward, were present. The troopers searched the vehicle. Trooper Melzer testified that, upon removing defendant from the vehicle, he smelled the odor of a masking agent—perfume or something similar—that had been sprayed inside the vehicle. When he had first approached the vehicle after the initial stop, he had not smelled it. There was perfume or odorizer spray in the vehicle.

¶ 26    Melzer searched defendant and did not find any illegal items on his person. Defendant was placed in the front seat of Benson's squad car because the troopers needed to keep him contained while they searched the vehicle. Benson remained with him. Defendant was not handcuffed.

¶ 27    In the vehicle's center console, troopers found about 466 grams of suspected cannabis (in four bags) and 134 grams of suspected cocaine (in one package). Defendant was arrested.

¶ 28    On cross-examination, Trooper Melzer testified that the vehicle was registered to Moneisha Bolden, a friend of Jackson's who had loaned him the car that day.

¶ 29    Melzer did not stop Jackson's vehicle immediately because there were safety issues on the interstate, including a hill before milepost 19½ and then a "sweeping curve" before the bridge over the Kishwaukee River. Melzer effected the stop just after the bridge.

¶ 30    Jackson's license listed a Chicago address, and he stated that he and defendant were headed home to Wisconsin. While in the vehicle, Melzer confirmed there were no outstanding warrants or wants both in Illinois and Wisconsin and he checked the validity of Jackson's license in both states. There was an outstanding warrant for Jackson that Melzer determined was not extraditable north of I-24, which is in southern Illinois.

¶ 31    When he first approached Jackson and informed him that he was speeding five miles over the speed limit, Jackson, according to Melzer, stated that "I get five or I'm allowed five." While in Melzer's vehicle, they had a conversation about appropriate speeds. Melzer noticed that Jackson was nervous, and he stuttered often when he spoke. Jackson also watched Trooper Taylor in the rearview mirror, looked all over the vehicle, and did not take his eyes off the K-9 during the sniff. When asked "basic questions, he would pause first, think. He said umm a few times and then would answer the question." Jackson also tried to read Melzer's computer screen.

¶ 32    After Taylor made contact with defendant and then relayed information to Melzer, he noted that there was a very strong odor of a masking agent in Jackson's vehicle. Melzer documented this by photographing a perfume or cologne bottle in a cup holder.

¶ 33    Jackson was not able to give specific information as to where he was going, but stated it was close to Madison. At one point, he thanked Melzer for telling him about the speeding because he sometimes likes to go a bit over the speed limit. When Melzer asked Jackson if defendant was going to stay with him in Wisconsin, Jackson replied that he was not going to do so and was merely visiting.

¶ 34    When Trooper Melzer asked defendant to exit the vehicle, Melzer noticed the odor of burnt cannabis emanating from defendant. After Jackson was told that the K-9 alerted, Jackson commented that, earlier, they had smoked in the vehicle.

¶ 35    Illinois State Police Trooper Alan Taylor testified that he is a K-9 handler. He arrived at the scene at 12:26 p.m. He was in the area when he learned that Trooper Melzer had initiated a traffic stop and drove to the area to assist. It took Taylor less than five minutes to arrive at the scene. When he arrived, Melzer asked Taylor to make contact with the passenger to ascertain his travel plans for the day to determine if his story matched that of Jackson.

¶ 36    Taylor did not notice anything unusual about defendant. Defendant told Taylor that he was going to visit an aunt, but he did not state whose aunt it was. Defendant was cooperative and did not appear nervous. The conversation lasted for one or two minutes. Afterward, on his way to his squad car, Taylor gave Melzer defendant's license. (Defendant's license listed a Chicago address, which was about 90 miles from the location of the stop.) Melzer requested a free-air sniff of the vehicle, and the K-9 alerted to the odor of narcotics on the rear passenger side of the vehicle. After Taylor notified Melzer, a search was completed.

¶ 37    On cross-examination, Trooper Taylor testified that defendant did not provide any specific information concerning his travel plans, such as the town or address in Wisconsin. When he approached Jackson's vehicle, Taylor smelled what he believed was a masking agent, *i.e.*, an overwhelming odor of perfume or cologne.

¶ 38    On re-direct examination, he testified that, in his report, he stated that he smelled an overwhelming odor of air freshener coming from the vehicle. Taylor testified that air fresheners were located in the car, including one hanging from the rearview mirror, one clipped into a vent, and one attached to a seatbelt. Also, a bottle of perfume was recovered from the vehicle.

¶ 39                    D. Trial Court's Ruling on Suppression Motion

¶ 40    The trial court determined that Trooper Melzer had reasonable and articulable suspicion and probable cause to stop Jackson's car for speeding. It also found that defendant did not have a privacy interest in the vehicle such that he could contest the validity of the search of the vehicle. Accordingly, it denied defendant's suppression motion as to the cannabis and cocaine found in the vehicle.

¶ 41    On June 12, 2019, the trial court, in a memorandum of decision, addressed and rejected defendant's argument that his post-arrest custodial statements should be suppressed because there was no probable cause to arrest him. The court found that the "inconsistent and implausible travel itinerary, the spraying of the perfume and the location of the contraband are evidence of not only knowledge of the existence of the contraband but also some interest in it (by trying to conceal it). This rises to the level of probable cause." Specifically, the court noted that Jackson had stated that he lived in Chicago and that the Chicago address on his driver's license was correct, but later stated that he had moved to Wisconsin and, when asked where he lived in Wisconsin, he did not know the address. Also, when asked about his travel plans, Jackson stated that he was heading "home"

to Wisconsin, his aunt also lived there, and defendant was not going to be staying with him. Defendant stated that he was going to Wisconsin to visit his aunt but did not provide much detail about the trip, and no personal items were found in the vehicle. Perfume was found in the center console, as were several air fresheners. The "significant circumstantial evidence," the court found, showed that defendant sprayed the perfume in the car during the time he was alone in the car, which suggested both knowledge of the contraband and an interest in it through attempts at concealment.

¶ 42                           E. Bench Trial and Sentencing

¶ 43    At the bench trial, the parties stipulated that, if called to testify, forensic scientist Edward McGill would state that he performed chemical analysis consistent with current scientific practices on the State's exhibits Nos. 1 and 2—the bags removed from Jackson's vehicle. Exhibit No. 1 was a substance containing cocaine that weighed 123.7 grams, and exhibit No. 2 constituted a substance containing cannabis that weighed 424.3 grams. State exhibit No. 3 was McGill's lab report.

¶ 44    Rockford police officer Ronald Berke testified that, in November 2018, he worked for the Illinois State Police's SLANT (Stateline Area Narcotics Team) division and conducted drug investigations. On November 13, 2018, Berke and inspector Johnson met with defendant at the IDOT building. After being Mirandized, defendant agreed to speak with them. Defendant stated that he and Jackson were "blood cousins" and "true family" and were very close. The vehicle Jackson drove belonged to Jackson's girlfriend. Defendant also stated that Jackson picked him up that day to drive to Jackson's aunt's house, spend the day and possibly the night, and then drive back to Chicago.

¶ 45    Trooper Melzer testified that, on November 13, 2018, at about 12:20 p.m., he stopped a white Chevy Malibu for travelling 75 miles per hour in a 70-miles-per-hour zone (per his radar). He had followed and caught up to the vehicle, at which point it was traveling 60 miles per hour. Melzer could not see the driver until he approached the passenger side of the vehicle. The driver was Jackson, a black male in his 20s. The passenger, defendant, was a "20-ish" black male. Defendant was reclined in the front passenger seat. Melzer spoke with Jackson and requested his license and insurance before asking him to accompany Melzer back to his car.

¶ 46    While completing the enforcement action, Trooper Taylor arrived, and Melzer asked him to go speak with the passenger. Taylor obtained identification from defendant, which listed his residence as Chicago, and returned to his squad car.

¶ 47    Trooper Melzer asked Taylor to have his K-9 conduct a free-air sniff because, when Melzer caught up to the vehicle on the interstate, the vehicle slowed to 60 miles per hour in a 70-miles-per-hour zone. He also saw multiple air fresheners in the vehicle, and the occupants provided inconsistent statements. Also, neither occupant owned the vehicle, and it was unclear whose vehicle it was and how they obtained it.

¶ 48    During the sniff, Melzer saw the K-9 sit and stare at the vehicle, which is indicative of a positive alert (and Taylor informed him of such). After Taylor and the K-9 returned to Taylor's squad car, Melzer approached defendant and asked him to exit the vehicle. Upon this second approach, Melzer noted the odor of perfume or cologne in the vehicle, which he had not noticed during this first approach. The odor was "overwhelming." As defendant stepped out of the vehicle, Melzer noted the odor of burnt cannabis on his person. Melzer searched defendant for contraband and found none. Master Sergeant Benson arrived and took defendant to his squad car.

¶ 49    Troopers Melzer and Taylor searched the vehicle and found four bags of green leafy substance Melzer suspected was cannabis and one package of a white rock-like substance he suspected was cocaine.  The items were found underneath the center gear-shift console. Photographs of the vehicle interior showed the air fresheners on the rearview mirror, air vent, and seat belt and a perfume bottle in the center console.  Photographs also depicted three cell phones that were located in the console area and the suspected cannabis and cocaine in the console area. Melzer did not find in the vehicle or on the persons of defendant and Jackson any items indicative of personal ingestion of cocaine or cannabis.

¶ 50    He arrested Jackson and defendant, who were then transported to a processing facility. After speaking with Berke and Johnson at the facility, defendant asked Melzer what he was being charged with.  Melzer explained to defendant the potential charges and stated that he could not corroborate defendant's story.  Defendant stated he was visiting his aunt, provided a phone number, and gave Melzer permission to speak to his aunt, who would "confirm his story."  When Melzer called the number, a woman who stated she was defendant's mother answered.  She stated she was in Chicago, not in Madison, had not been to Madison, or on her way to Madison that day. She did not give her name.  When Melzer explained to defendant what the woman stated, defendant dropped his head as if he was "dejected or defeated."  The court allowed this testimony over defendant's objection, finding that it constituted a "tacit admission" by defendant that his "alibi story" was not valid.

¶ 51    On cross-examination, Trooper Melzer testified that, when he first approached the vehicle, he did not notice anything unusual about defendant.  He remained at the vehicle for about 1 to 1½ minutes before returning with Jackson to his vehicle.  While Jackson was seated in the front passenger seat of Melzer's vehicle, Melzer observed that Jackson appeared uncomfortable and that

his carotid artery on the left side of his neck visibly pulsed (which is indicative of a faster heartbeat and nervousness). He looked around the vehicle "a lot," especially when answering questions. Jackson also said "umm" or stuttered before answering Melzer's questions. After Trooper Taylor arrived, Jackson spent the entire time watching Taylor's squad car and his activities.

¶ 52     While in Melzer's vehicle, Melzer conversed with Jackson but also observed Jackson's vehicle. He did not notice defendant making any furtive movements in the vehicle. Jackson's vehicle was registered to Moneisha Bolden, who was defendant's girlfriend.

¶ 53     Melzer noticed the smell of burnt cannabis emanating from defendant when he had him exit the vehicle. Also, in his police report, Melzer mentioned the smell of perfume or cologne (to which he referred to as an air odorizer) emanating from the car. The perfume bottle was not taken into evidence or tested.

¶ 54     Trooper Taylor testified that, at the time of the stop, he was a certified K-9 handler and his certified K-9 at the time was "Bart." Upon arriving at the scene, Melzer asked Taylor to speak with the passenger in the vehicle and obtain his travel plans. Taylor spoke to defendant, who stated he was going to see an aunt in Wisconsin for a day or two. He was not able to provide a specific location in Wisconsin.

¶ 55     Taylor noticed air fresheners in the vehicle and an "overwhelming odor of air freshener." Defendant gave Taylor his driver's license, and Taylor gave the license to Melzer, who then requested that Taylor have his K-9 conduct a free-air sniff of the vehicle. The dog alerted near the rear passenger door. Prior to searching the vehicle, Taylor moved it further inside the road shoulder. During the search, Melzer located four bags of a green leafy substance suspected to be marijuana and a bag of a white substance suspected to be cocaine.

¶ 56    Edward Rottman, a fingerprint examiner at the Rockford crime laboratory, testified as an expert in fingerprint identification and examination. He found a latent print on one of the bags of cannabis and determined that the print made by the right index finger was of the same person whose prints were on State exhibit No. 16 (*i.e.*, defendant's prints). He was unable to determine how long the print had been on the bag.

¶ 57    Chris Washburn, a supervisor of the Belvidere and Boone County Narcotics Unit, testified as an expert in narcotics trafficking. In his experience, the most cocaine anybody had purchased for personal use at one time was seven grams. Generally, there would be indications of personal use, such as rolled up paper currency, plastic straws, or keys that are used to inhale cocaine through the nose. After reviewing the evidence in this case, Washburn determined that the 123 grams of cocaine was possessed with the intent to deliver and believed that it cost up to $6000 to purchase.

¶ 58    Washburn concluded that the cannabis was also possessed with the intent to deliver because there was no evidence the cannabis was used for personal use, such as cigar wrappers or pipes, and it was broken down into multiple packages and concealed with the cocaine. He acknowledged that one pound of cannabis could be for personal use. However, 123 grams of cocaine was not for personal use.

¶ 59    On July 8, 2020, the trial court found defendant guilty of possession of cocaine, possession with intent to deliver the cocaine, and possession of cannabis. It found defendant not guilty of possession with intent to deliver cannabis. On August 7, 2020, defendant moved for judgment notwithstanding the verdict or, alternatively, a new trial, arguing that the court erred in denying his suppression motion, challenging the sufficiency of the evidence, and arguing that the court erred in allowing testimony relative to a tacit admission. The court denied the motion. It sentenced defendant, on August 28, 2020, to concurrent prison terms of 10 years (served at 75%) and three

years (served at 50%) for possession with intent to deliver cocaine and possession of cannabis, respectively. Defendant appeals.

¶ 60                                II. ANALYSIS

¶ 61    Defendant argues that trial counsel was ineffective for failing to argue in the suppression motion that Trooper Melzer improperly prolonged the seizure of defendant and did not diligently complete the mission of the traffic stop. For the following reasons, we reject defendant's argument.

¶ 62    Where an ineffective-assistance-of-counsel claim is raised for the first time on appeal, our review is *de novo*. *People v. Bustos*, 2020 IL App (2d) 170497 ¶ 87.

¶ 63    To prevail on an ineffective-assistance-of-counsel claim, a defendant must show that (1) counsel's representation fell below an objective standard of reasonableness; and (2) the deficient performance so prejudiced the defendant as to deny him or her a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984); *People v. Bew*, 228 Ill. 2d 122, 127 (2008). Specifically, the defendant must prove that counsel's performance was objectively unreasonable under prevailing professional norms and there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *People v. Hughes*, 2012 IL 112817, ¶ 44.

¶ 64    Whether a suppression motion should be filed in a criminal case is a matter of trial tactics and has little bearing on competency of counsel. *People v. Peterson*, 248 Ill. App. 3d 28, 38 (1993); *People v. Atkins*, 161 Ill. App. 3d 600, 609 (1987). A reviewing court will not extend its inquiry into areas involving the exercise of judgment, discretion, trial tactics, or strategy. *Id.* The decision of whether to file a motion to suppress is best left to trial counsel's discretion. *Id.*; *People v. Bryant*, 128 Ill. 2d 448, 458 (1989).

¶ 65    "[W]here an ineffectiveness claim is based on counsel's failure to file a suppression motion, in order to establish prejudice under *Strickland*, the defendant must demonstrate that the unargued suppression motion is meritorious, and that a reasonable probability exists that the trial outcome would have been different had the evidence been suppressed." *People v. Henderson*, 2013 IL 114040, ¶ 15.  A reasonable probability is a probability sufficient to undermine confidence in the result at trial, and actual prejudice must be shown rather than mere speculation.  *People v. Bew*, 228 Ill. 2d 122, 135 (2008); *People v. Graham,* 206 Ill. 2d 465, 476 (2003).

¶ 66    We conclude that defendant's suppression argument would not have prevailed and, thus, we reject his ineffective-assistance claim.  The federal and state constitutions protect citizens from unreasonable searches and seizures.  U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6.  As with the driver of a vehicle, a passenger of a vehicle is seized within the meaning of the fourth amendment when a police officer makes a traffic stop.  *Brendlin v. California*, 551 U.S. 249, 251 (2007).  A police officer's decision to stop a vehicle is reasonable where the officer has probable cause to believe a traffic violation occurred.  *Whren v. United States*, 517 U.S. 806, 810 (1996). An initially lawful seizure can violate the fourth amendment if its manner of execution unreasonably infringes interests protected by the Constitution.  *Illinois v. Caballes*, 543 U.S. 405, 407 (2005).  For example, a traffic stop that is justified by the interest in issuing a warning ticket to the driver can become unlawful if it is "prolonged beyond the time reasonably required to complete that mission."  *Id.*  In determining whether a stop was prolonged beyond the time reasonably required to complete its mission, courts consider the totality of the circumstances, looking specifically at the duration of the stop and the officer's diligence in fulfilling the purpose of the stop."  *People v. Sanchez,* 2021 IL App (3d) 170410, ¶ 29.

¶ 67    "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). Moreover, with regards to duration, our supreme court has stated a "seizure remains lawful only 'so long as [unrelated] inquiries do not measurably extend the duration of the stop.' " *Id.* at 355 (quoting *Arizona v. Johnson*, 555 U.S. 323, 333 (2009)).  In other words, a police officer may conduct certain unrelated checks during an otherwise lawful traffic stop, but the officer "may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.*

¶ 68    In looking at the length of the stop, no bright-line rule has been adopted to indicate when a stop has been unreasonably prolonged. *Baldwin*, 388 Ill. App. 3d at 1034.  Instead, the duration of the stop must be justified by the nature of the offense and "the ordinary inquiries incident to such a stop." *Caballes*, 543 U.S. at 408; *People v. Driggers*, 222 Ill. 2d 65, 73 (2006); *People v. Koutsakis*, 272 Ill. App. 3d 159, 164 (1995) ("Courts must consider the purpose to be served by the stop as well as the time reasonably needed to effectuate those purposes.").  "Typically[,] such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez*, 575 U.S. at 355.  "An officer may ask additional questions or have a dog sniff performed, even though those tasks are not related to the mission of the stop if they do not prolong the stop." *People v. Sadeq*, 2018 IL App (4th) 160105, ¶ 69.  The relevant inquiry is whether the dog sniff prolonged the traffic stop, not whether it occurs before or after the officer issued the ticket. *Rodriguez*, 575 U.S. at 1612, 1616 (holding that, if it would add time to a traffic stop, officer could not conduct dog sniff of vehicle absent reasonable suspicion).

¶ 69 Defendant argues that, rather than write him a warning ticket for speeding, Trooper Melzer prolonged the seizure by having Jackson accompany him to his car, where, for about seven minutes, he peppered him with unnecessary questions, including asking him (and having Taylor later ask defendant) about inconsequential travel plans until Taylor was able to conduct a free-air sniff on Jackson's vehicle. After the K-9 alerted to narcotics in the vehicle, Melzer and Taylor searched the car and located drugs underneath the center console area. Melzer, defendant contends, has a personal policy of conducting what amounts to a fishing expedition to determine if there are other crimes being committed. He testified that he requested Taylor to conduct the dog sniff because he suspected additional criminal activity was afoot based on what he believed to be inconsistent travel plans and because Jackson appeared nervous and had slowed down his vehicle to 60 miles per hour prior to being stopped. The seizure became unlawful, defendant asserts, when Trooper Melzer prolonged the stop by engaging in activities unrelated to the mission that justified the stop—writing a warning ticket—and instead pursued a fishing expedition in search of other criminal activity.

¶ 70 Defendant notes that seven minutes elapsed from the time that Jackson entered Trooper Melzer's vehicle until Trooper Taylor started to conduct the free-air sniff with his K-9. Although the stop was brief in duration, rather than working on completing the warning, defendant asserts, Melzer testified that he asked questions of Jackson to try to determine whether Jackson and defendant were committing any crimes other than speeding. Melzer testified that he wanted Taylor to ask defendant questions about his travel plans to ascertain whether other activity was afoot. This conduct, defendant argues, prolonged the stop beyond the time necessary to complete its mission, it was unlawful, and transformed the stop into an unreasonable seizure, requiring suppression of any evidence obtained subsequent to the unlawful seizure.

¶ 71    Apparently addressing whether Melzer had reasonable suspicion to prolong the stop, defendant takes issue with Trooper Melzer's characterization of his and Jackson's travel plans. He contends they were not inconsistent or implausible, because both men told Melzer that they were travelling to Wisconsin. Defendant stated that he was visiting an aunt in Wisconsin, and Jackson told Melzer that his aunt lived close to Madison. Although they did not provide a specific location to which they were traveling, the video, defendant notes, showed that Jackson believed his aunt lived in "South Perry." Although he could not recall the specific address, he told Melzer that he entered the location on his GPS to get there. Melzer, he notes, did not ask for the specific address. Defendant also argues that Jackson's nervousness did not provide objective justification for Melzer's suspicion that criminal activity was afoot because his nervousness did not distinguish him from a substantial portion of innocent drivers who are stopped for traffic violations.

¶ 72    We reject defendant's arguments and conclude that the stop was not unreasonably prolonged. First, the stop, as defendant concedes, was brief. Melzer stopped Jackson's vehicle at 12:20 p.m., Taylor arrived at the scene at 12:26 p.m., the K-9 alerted at 12:29:20 p.m., and Melzer completed writing the warning between 12:32:00 and 12:32:45 p.m., when he told Jackson that he would print it out for him. A 12-minute stop is generally not unreasonably long. See *People v. Canizalez-Cardena*, 2012 IL App (4th) 110720 (free-air sniff 7 to 8 minutes into a traffic stop did not prolong the stop, and a stop of 10 to 12 minutes to issue a warning ticket was reasonable); *People v. Kats*, 2012 IL App (3d) 100683 (nine-minute stop to issue a warning ticket was sufficiently brief); *People v. Staley*, 334 Ill. App. 3d 358 (2002) (18-minute traffic stop that included confirming the status of defendant's driver's license and license plate registration and issuing two traffic citations was not unduly long).

¶ 73    Second, we conclude that Trooper Melzer diligently processed the warning.  In *People v. Heritsch*, 2017 IL App (2d) 151157, ¶ 13, this court held that, where drugs are detected during a time when an officer would otherwise still have been writing a ticket, no time has been added to the traffic stop.  Defendant contends that the questioning of Jackson concerning his travel plans was unrelated to the stop's mission, was spaced out over the course of seven minutes in an attempt to extend the duration of the stop while waiting for Taylor to arrive, and was intended to ascertain if criminal activities were afoot.  We reject defendant's contention.  Even if the questioning was unrelated to the stop's mission, so long as it did not extend the duration of the stop, it was not unlawful.  *Sanchez*, 2021 IL App (3d) 170410, ¶ 33.  Trooper Melzer questioned Jackson about his travel plans while also processing the warning, including running a warrant check[1] and checking on the validity of his driver's license, and, later, defendant's license.  Throughout their conversation, he kept Jackson updated on his checks.  During the processing, Trooper Taylor arrived with is K-9 and performed the free-air sniff.  Melzer testified that he did not call for Taylor to come, and Taylor testified that he was in the area, learned that Melzer had initiated a stop, and drove there to assist.  Jackson's car was stopped at 12:20 p.m., the dog alerted at 12:29:20 p.m., Melzer finished the written warning (but had not printed it) at 12:32:00 p.m. (about 11 minutes 15 seconds into the stop), and the total length of the stretches of conversation not directly related to the speeding and warning, as the State notes, was 1 minute 57 seconds, not 7 total minutes as defendant contends.  Thus, subtracting the length of the conversation (1 minute 57 seconds) from

---

[1] Arguably, having Jackson, whose record showed an outstanding warrant that prompted discussion, sit in Melzer's vehicle while Melzer processed the warning shortened the length of the stop.

the time Melzer finished writing the warning (12:32:00 p.m.) gives us a theoretical conversation-free completion time of 12:30:03 p.m. The dog alerted before this, at 12:29:20 p.m. And, although completed, the warning still needed to be printed. Under the totality of the circumstances, Melzer was diligent and did not impermissibly prolong the search.

¶ 74 In summary, because an argument that the stop was unreasonably prolonged would not have prevailed, defendant has failed to establish that trial counsel was ineffective for to include such argument in a suppression motion.

¶ 75                                     III. CONCLUSION

¶ 76 For the reasons stated, we affirm the judgment of the circuit court of Boone County.

¶ 77 Affirmed.